ᴇSTATE OF AARON LEVINE, DECEASED, HARVEY LEVINE, EXECUTOR, ET AL., AND ANNA LEVINE, SURVIVING WIFE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 782–76.     Filed August 6, 1979.

*Martin Rosen* and *Barry L. Gardiner*, for the petitioners.
*Rudolph J. Korbel* and *Joan Ronder Domike*, for the respondent.

FORRESTER, *Judge:* For their taxable years ended July 31, 1969 and 1970, respondent has determined deficiencies in petitioners' Federal income taxes in the respective amounts of $19,718.49 and $175,244.03. He has also determined a section 6651(a)[1] addition to tax in the amount of $2,353.11 for the year 1969.

---

[1]Unless otherwise specified, all statutory references are to the Internal Revenue Code of 1954.

Concessions having been made, the following issues remain for our decision:

(1) Whether decedent realized capital gain during the taxable year ended July 31, 1969, upon the receipt of boot in an otherwise valid section 1031 exchange which occurred in taxable year 1968; and

(2) Whether decedent realized capital gain upon the transfer of certain real property, with outstanding encumbrances that exceeded its adjusted basis, to a trust which assumed the obligations.

## FINDINGS OF FACT

All of the facts have been fully stipulated and are so found. Those necessary to an understanding of the case follow.

Aaron Levine (hereinafter decedent) and Anna Levine,[2] as husband and wife, filed joint Federal income tax returns for the years in issue with the District Director in Andover, Mass. The executor of decedent's estate, Harvey Levine (hereinafter petitioner or Harvey), resided in Woodmere, N.Y., at the time the petition herein was filed.

Decedent and Harvey managed various commercial real estate properties in which they held an interest. They owned, as tenants in common, a commercial building located at 187 Broadway, New York, N.Y. As the lessors and property managers, they provided the tenants with necessary services. The property's books and records were maintained on a calendar year basis at decedent's office in New York. No partnership returns were ever filed with respect to this property; nevertheless, the income or loss from the property was reported, pro rata, on the fiscal yearend return of decedent and the calendar yearend return of petitioner.

Decedent and Harvey also owned, as tenants in common, a building at 183 Broadway, New York, N.Y. As with the 187 Broadway property, they performed various management services in conjunction with their ownership of the 183 Broadway property. On July 1, 1968, decedent and Harvey exchanged the property at 187 Broadway for the like kind property at 183 Broadway. As a result of this transaction, decedent received

---

[2] Petitioner Anna Levine is a party herein only because of the joint returns she filed with decedent.

additional consideration of $60,000 which he failed to include as gain realized from the 1968 exchange, either on his return for the year ended July 31, 1968, or his return for the year ended July 31, 1969.

In addition to the above properties, decedent owned income-producing property at 20–24 Vesey Street, New York, N.Y. This property was originally purchased on November 1, 1944, by decedent's wholly owned corporation. On August 22, 1957, the corporation, in conjunction with its dissolution, made a liquidating distribution of the property to decedent.

On March 17, 1966, decedent obtained from the Bowery Savings Bank a mortgage consolidation of $500,000, representing the consolidation of numerous earlier mortgages made with respect to the subject property. The mortgage history giving rise to such consolidation is as follows:

SCHEDULE OF MORTGAGE HISTORY: 20–24 VESEY STREET

(1) On October 27, 1944, a purchase money mortgage was executed for $148,000.00 in favor of Mutual Life Insurance Company of New York.

(2) On August 9, 1950, a mortgage loan for $120,108.97 was received from the Seamen's Bank for Savings and was consolidated with the $129,891.03 balance of the above purchase money mortgage into a new $250,000.00 mortgage.

(3) On July 30, 1953 a mortgage loan for $100,000.00 was received from James John Trading Corp.

(4) On August 10, 1955 a mortgage loan for an additional $100,000.00 was received from James John Trading Corp.

(5) On June 17, 1958, a mortgage loan for $214,955.77 was received from Bowery Savings Bank and was consolidated (with the $235,044.23 combined balance of the consolidated mortgage referred to in paragraph (2) hereof and the two mortgages described in paragraphs (3) and (4) of this Schedule) into a new mortgage loan of $450,000.00.

(6) On May 17, 1963 a mortgage loan for $120,000.00 was received from The Morris Morgenstern Foundation.

(7) On March 17, 1966, a mortgage loan of $37,001.77 was received from Bowery Savings Bank and was consolidated (with the $462,998.23 balance of the consolidated mortgage referred to in paragraph (5) of this Schedule and the mortgage referred to in paragraph (6) of this Schedule) into a new mortgage loan of $500,000.00, which became a standing mortgage.

Decedent obtained, on November 21, 1968, an additional mortgage on the Vesey Street property from the Commercial Trading Co. in the amount of $300,000. All of the nonrecourse mortgages were secured by the underlying Vesey Street proper-

ty which had an appraised value, as of January 1, 1970, of $925,000.

On or about January 1, 1970, decedent transferred, inter alia, the Vesey Street property to a trust dated December 1, 1969, created by decedent, as a sole grantor, for the benefit of his three grandchildren. At the time of this transfer, there existed outstanding mortgages and liabilities on such property, all of which were assumed by the trust.

Pursuant to this transfer, decedent timely filed Form 709, U.S. Gift Tax Return, and reported the transfer as follows:

20–24 Vesey Street, city, county and
State of New York—appraisal value ........................................ $925,000.00

*Mortgages:*

| | | |
|---|---|---|
| Bowery Savings Bank ...................... | $500,000.00 | |
| Interest accrued 12/1/69 to 12/31/69 ... | 2,291.67 | |
| Commercial Trading[1] ........................ | 280,000.00 | |
| Interest accrued 12/1/69 to 12/31/69 ... | 3,616.67 | |
| | | $785,908.34 |

*Expenses incurred by donor in 1969*
*and assumed and paid by donee:*

| | | |
|---|---|---|
| Improvements ................................. | $117,716.53 | |
| Supplies ....................................... | 387.83 | |
| Repairs ........................................ | 1,253.93 | |
| Paint ........................................... | 63.60 | |
| Electricity ..................................... | 1,827.56 | |
| Steam ......................................... | 3,324.13 | |
| Total expenses ............................................... | 124,573.58 | |
| Total mortgages, interest, and expenses ............................. | | 910,481.92 |
| Equity ......................................................................... | | 14,518.08 |

---

[1] Between November 1968 and January 1970, $20,000 of the $300,000 principal was amortized.

The mortgage loan funding on the property from 1944 to the time of transfer totaled $1,140,066.51. Of this amount, $671,957.54 was in mortgages placed on the property by decedent after his receipt of the property in 1957. Payments on these mortgages amounted to $360,066.51, of which $127,001.77 was paid by decedent from 1957 until the 1970 transfer.

In addition, during the period from August 22, 1957, through January 1, 1970, decedent invested $334,452 in the form of permanent improvements to the property. His adjusted basis for the property, as of January 1, 1970, was $485,429.55. At the time of the transfer to the trust, the excess of liabilities (inclusive of

mortgages and other liabilities) over decedent's adjusted basis for the Vesey Street property was $425,051.79.

In the statutory notice of deficiency, respondent determined that petitioner recognized gain to the extent of boot, under section 1031(b), on the July 1, 1968, exchange since the operation of the property in question was deemed a partnership under section 761. Respondent further determined that petitioner realized gain on the January 1, 1970, transfer of the Vesey Street property to a trust because the outstanding mortgage loans and other expenses were assumed by the trust and are properly treated as amounts received pursuant to section 1001(a).

OPINION

The parties are in agreement that decedent received $60,000 of capital gain as a result of the section 1031 exchange on July 1, 1968. However, the parties disagree on whether decedent should have reported it for Federal income tax purposes on his return for the taxable year ended July 31, 1969. This issue further raises the subsidiary question of whether a partnership existed between the parties and, if so, whether it was terminated by the exchange.

Assuming, arguendo, that a partnership existed, petitioner contends that such partnership with respect to the 187 Broadway property terminated for tax purposes on July 1, 1968, the date that said property was exchanged for like kind property located at 183 Broadway. Respondent, on the other hand, argues that no terminating event, within the meaning of section 708(b)(1), had occurred; consequently, the partnership continued in existence and its taxable year did not end on July 1, 1968.

Section 761(a) defines a partnership to include "a syndicate, group, pool, joint venture or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on." See also sec. 7701(a)(2). Section 1.761–1(a), Income Tax Regs., furnishes additional guidance on the question of whether a partnership is created, in fact, absent some form of agreement:

(a) *Partnership.* * * * The term "partnership" is broader in scope than the common law meaning of partnership, and may include groups not commonly called partnerships. * * * A joint undertaking merely to share expenses is not a partnership. For example, if two or more persons jointly construct a ditch

merely to drain surface water from their properties, they are *not* partners. Mere coownership of property which is maintained, kept in repair, and rented or leased does *not* constitute a partnership. For example, if an individual owner, or tenants in common, of farm property lease it to a farmer for a cash rental or a share of the crops, they do not necessarily create a partnership thereby. *Tenants in common, however, may be partners if they actively carry on a trade, business, financial operation, or venture and divide the profits thereof. For example, a partnership exists if coowners of an apartment building lease space and in addition provide services to the occupants either directly or through an agent.* * * * [Emphasis supplied.]

See also sec. 301.7701–3, Proced. & Admin. Regs.; *McShain v. Commissioner*, 68 T.C. 154, 160 (1977).

Furthermore, it is well settled that whether a partnership exists is a question of fact. *Commissioner v. Tower*, 327 U.S. 280 (1946). The crucial test emerging from partnership cases is whether decedent and Harvey intended to create, as evidenced by their actions, a partnership, notwithstanding the lack of characterization of their relationship. *Commissioner v. Culbertson*, 337 U.S. 733 (1949). See also *Gilford v. Commissioner*, 201 F.2d 735, 736 (2d Cir. 1953), affg. a Memorandum Opinion of this Court.

While not conceding the issue, petitioner has cited no cases in support of his contention that a partnership did not exist between decedent and Harvey. Apparently, petitioner seeks to buttress his contention by relying upon the parties' lack of characterization of their relationship.

It is clear from the facts that both subject properties were held by decedent and Harvey as tenants in common. Moreover, all profits and losses on such properties were shared equally. Decedent and Harvey engaged in the active conduct of a trade or business. This is evidenced by the fact that they furnished property management services to the tenants of their many real estate properties, including the two properties at issue.

Tenants in common who rent their property are not ipso facto partners for tax purposes. *Hahn v. Commissioner*, 22 T.C. 212, 214 (1954). Nevertheless, the evidence in the record overwhelmingly supports a finding that decedent and Harvey intended to, and did, operate as a partnership. They engaged in an active business, performed various services, and shared the gains and losses. Such factors are more indicative of an intent to manage

the properties as a partnership than as a mere passive investment.[3] We find that decedent and Harvey were engaged in the operation of a partnership with respect to the 183 Broadway Street property and the 187 Broadway Street property.

Petitioner further contends that, assuming a partnership is found to exist, such partnership terminated for tax purposes on July 1, 1968, the date that such property was exchanged for like kind property at 183 Broadway. In opposition, respondent maintains that the exchange on said date of the 187 Broadway property for like kind property at 183 Broadway was effected in furtherance of the continuing partnership of decedent and his son.

Section 708(a) states the general rule that an existing partnership shall be considered as continuing if it is not terminated. Subsection (b) of section 708 indicates when a partnership is considered terminated for subsection (a) purposes. It provides:

> (b) TERMINATION.—
> (1) GENERAL RULE.—For purposes of subsection (a), a partnership shall be considered as terminated only if—
> (A) no part of any business, financial operation, or venture of the partnership continues to be carried on by any of its partners in a partnership, or
> (B) within a 12-month period there is a sale or exchange of 50 percent or more of the total interest in partnership capital and profits.

Petitioner's argument focuses on section 708(b)(1)(A). He posits that all business operations of the 187 Broadway partnership were discontinued on July 1, 1968, since the partnership's sole asset was used in the exchange. Therefore, the partnership was effectively terminated within the meaning of section 708(b)(1)(A). It would necessarily follow from this conclusion that the partnership year closed upon its termination on July 1, 1968, pursuant to section 706(c), and that any gain realized on the exchange must fall within decedent's July 31, 1968, taxable year as provided by section 706(a). Decedent failed to report such gain on his fiscal year ended July 31, 1968, return and since the period of limitations on assessment and collection under section 6501(a) bars an assessment at this time, it is petitioner's position that

---

[3]Cf. *Huckle v. Commissioner*, T.C. Memo. 1968–45.

decedent's gain realized on the July 1, 1968, exchange is without tax consequence.

We do not agree. The decedent and Harvey performed the same services in their real estate business after the exchange as before. Moreover, after the exchange, the partnership continued to hold income-producing realty. Such property was held by the partnership and was not held by decedent and Harvey. The primary purpose of the partnership did not cease to exist. Cf. *Baker Commodities, Inc. v. Commissioner*, 48 T.C. 374 (1967), affd. 415 F.2d 519 (9th Cir. 1969). The record is silent as to whether decedent or Harvey intended to terminate their partnership and wind up its affairs. We can only assume that they intended to continue the operation of their real estate business as evidenced by facts such as the rendering of necessary services to the new property's tenants and the sharing of the profits and losses from the new property.

The principal argument raised in petitioner's brief circumnavigates these facts by focusing on the exchange of the partnership's only asset which, according to petitioner, results in the cessation of business operations of the partnership. However, this argument cannot prevail. Continuation of a partnership for tax purposes does not mean that the underlying partnership properties may never be sold or exchanged. To the contrary, we have held that the transfer by a partnership of all of its assets and its business activity to a corporation does not ipso facto terminate the existence of the partnership for Federal income tax purposes. *Foxman v. Commissioner*, 41 T.C. 535, 556–557 (1964), affd. 352 F.2d 466 (3d Cir. 1965).

Other courts have faced the question of partnership termination, in similar contexts, and found that the receipt of investment properties or promissory notes by the partnership, upon disposition of its properties, was sufficient for continuation of the partnership. *Baker Commodities, Inc. v. Commissioner*, 415 F.2d 519, 526 (9th Cir. 1969); *Ginsburg v. United States*, 184 Ct. Cl. 444, 396 F.2d 983 (1968). These cases are sufficiently similar to the instant case to be persuasive that there was no termination by reason of section 708(b)(1)(A).

Section 708(b)(1)(B) is equally inapposite to the instant case. Neither decedent nor Harvey had transferred any of their respective partnership interests within a 12-month period. Nor did the exchange of the properties constitute an exchange of 50

percent or more of the total interest in partnership capital and profits. See sec. 1.708–1(b)(1)(ii), Income Tax Regs. The transaction hereunder was merely a tax-free exchange of an existing partnership property for another. At no time was there a sale by either decedent or his son of any interest in partnership profits, hence there was no termination under section 708(b)(1)(B). See *Barran v. Commissioner*, 39 T.C. 515, 528 (1962), revd. on another issue 334 F.2d 58 (5th Cir. 1964).

It is clear that for Federal tax purposes, the partnership had not been terminated at the time of the exchange within the provisions of section 708(b)(1)(A) or section 708(b)(1)(B). As a result, the gross income of decedent includes his distributive share of the partnership's gains from the exchange of a partnership capital asset pursuant to section 702(c). The exchange of properties, accompanied by boot, occurred on July 1, 1968, which was during the taxable year of the partnership ended December 31, 1968. We find, therefore, that the taxable year of the partnership ending on that date is within decedent's taxable year ending July 31, 1969, and that he is required to include the $60,000 boot in his taxable income for said taxable year and we so hold.

The next issue is whether decedent realized gain upon the transfer of real estate, encumbered beyond its adjusted basis by mortgages and other outstanding liabilities, to a trust for the benefit of his grandchildren on about January 1, 1970. Petitioner's basic argument is that decedent need not recognize taxable income upon the transfer since the donee takes a substituted basis from the donor under section 1015. Thus, under petitioner's reasoning, the donee would immediately be faced with reduced depreciation deductions and eventually a larger capital gains tax upon the ultimate disposition of the property. Respondent, on the other hand, would have decedent recognize gain upon the transfer of the property, measured by the excess of the mortgages and assumed liabilities over adjusted basis.

It is petitioner's theory that decedent realized nothing upon the transfer of the property (20–24 Vesey Street) and so there was nothing to tax as a gain under section 1001(a) and (b). Said subsections provide, in pertinent part:

(a) COMPUTATION OF GAIN OR LOSS.—The gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided in section 1011 for determining gain, and the

loss shall be the excess of the adjusted basis provided in such section for determining loss over the amount realized.

(b) AMOUNT REALIZED.—The amount realized from the sale or other disposition of property shall be the sum of any money received plus the fair market value of the property (other than money) received. * * *

That there was a disposition of the property by decedent seems clear. He made a complete and irrevocable transfer of the property to a trust for the benefit of his grandchildren. The question, however, is not whether a disposition occurred within the meaning of section 1001(b), but whether a gain was realized from such disposition. Therefore, the threshold question is whether decedent received from his disposition of the property, money or other property of a value in excess of his adjusted basis.

When decedent received the property upon the liquidation of his wholly owned corporation in 1951, his basis was its fair market value as determined under section 334(a). Since his receipt of the property and until the date of its disposition in 1970, he obtained $671,957.54 as a result of additional nonrecourse mortgage loans, repaid $127,001.77 of outstanding mortgage loans, and invested $334,452 of mortgage proceeds in the form of improvements to the property. We must conclude, therefore, that decedent retained $210,503.77 of mortgage proceeds for his personal use.[4]

On the date of the transfer to the trust, the mortgage liabilities totaled $780,000. In addition, there was $5,908.34 of accrued interest on such liabilities and $124,573.58 of expenses incurred by decedent—both of which were assumed and paid by donee. Of this last amount, $117,716.53 had been spent for permanent improvements to the property. The parties are in agreement that decedent's adjusted basis for the property on the transfer date to the trust was $485,429.55, and that the excess of the outstanding mortgages, interest, and other liabilities over the adjusted basis of the property was $425,051.79.

We believe that the posed question—whether this last named figure is gain to decedent—is governed by *Crane v. Commissioner*, 331 U.S. 1 (1947). Therein, a taxpayer inherited income-producing realty subject to a nonrecourse mortgage in an

[4]Petitioner argues that he did not stipulate that any mortgage proceeds were ever "retained as cash" by decedent; however, he has offered no proof that this balance of the mortgage proceeds ($210,503.77) was devoted, at any time, to the improvement of the subject property.

amount equal to the value of the property. Upon sale of the property, subject to the mortgage, taxpayer received net cash proceeds of $2,500 which she maintained was the amount realized on the sale. This sum, less her zero (equity) basis in the property, was the amount she reported as gain. The Supreme Court disagreed, however, stating that her basis in the inherited property was its value and further determined that the amount realized on the sale was equivalent to the cash received plus the nonrecourse mortgage taken subject to by the purchaser.

Upon reflection, it becomes clear that under both section 1001(a) and *Crane v. Commissioner*,[5] *supra*, decedent received a tangible economic benefit as measured by the excess of the mortgages, interest, and other assumed liabilities over the adjusted basis of the property. The Supreme Court indicated the nature of this economic benefit when it stated in *Crane* (331 U.S. at 14):

> we think that a mortgagor, not personally liable on the debt, who sells the property subject to the mortgage and for additional consideration, *realizes a benefit in the amount of the mortgage as well as the boot.* If a purchaser pays boot, it is immaterial as to our problem whether the mortgagor is also to receive money from the purchaser to discharge the mortgage prior to sale, or whether he is merely to transfer subject to the mortgage—it may make a difference to the purchaser and to the mortgagee, but not to the mortgagor. Or put in another way, we are no more concerned with whether the mortgagor is, strictly speaking, a debtor on the mortgage, than we are with whether the benefit to him is, strictly speaking, a receipt of money or property. We are rather concerned with the reality that an owner of property, mortgaged at a figure less than that at which the property will sell, must and will treat the conditions of the mortgage exactly as if they were his personal obligations. *If he transfers subject to the mortgage, the benefit to him is as real and substantial as if the mortgage were discharged, or as if a personal debt in an equal amount had been assumed by another.* [Fn. ref. omitted; emphasis supplied.]

Notwithstanding the tangible economic benefit which decedent received from this transaction, it is petitioner's contention

---

[5] On brief, petitioner asserts that *Crane v. Commissioner*, 331 U.S. 1 (1947), is limited to sale transactions and is, therefore, inapposite to the case at hand. Petitioner offers no support for this assertion. To the contrary, ample authorities exist that have applied the doctrine of the *Crane* case in numerous situations. See *Commissioner v. Fortee Properties*, 211 F.2d 915 (2d Cir. 1954) (condemnation); *Bolger v. Commissioner*, 59 T.C. 760 (1973) (net lease); *Mayerson v. Commissioner*, 47 T.C. 340 (1966) (unassumed mortgage purchase).

Furthermore, a close reading of the *Crane* case discloses that the basis for the Supreme Court's decision was not the form of the transaction but, rather, was the benefit which the transferor derived from the transaction. See *Crane v. Commissioner* 331 U.S. at 14. This economic benefit is present whether the transaction is labeled a sale or a combination gift and sale. Cf. *Malone v. United States*, 326 F. Supp. 106 (N.D. Miss. 1971), affd. per curiam 455 F.2d 502 (5th Cir. 1972).

that the transaction hereunder was a mere gift and, as such, no Federal income tax consequences result.[6] This contention begs the question. The conclusion naturally follows that a bona fide gift triggers no income tax consequences to the donor. However, such is not the case here.

In the instant case, we believe that decedent has taxable income upon the disposition of the encumbered property. The transaction may be viewed as a combination gift and sale. The transaction's gift appearance is determined by the net gift portion of the transfer, amounting to the $14,518.08 equity in the property at the time of transfer, and its sale aspect is measured by the taxable portion heretofore described. A part gift, part sale transaction will result in tax consequences to the donor and we have so held.[7] *Johnson v. Commissioner*, 59 T.C. 791, 807 (1973), affd. 495 F.2d 1079 (6th Cir. 1974). Since the assumption of the nonrecourse mortgage notes requires their inclusion in the amount realized under *Crane v. Commissioner, supra*, the result in the case sub judice is a partial sale. See also sec. 1.1001–1(e)(1), Income Tax Regs.

Petitioner argues further that the transaction at hand was a bona fide gift since the mortgage liabilities on the property were incurred many years beforehand. In support of this argument, he points to the mortgage history schedule which indicates that within the approximate 3¾-year period preceding the gift, only $37,001.77 of the mortgage funds had been borrowed.

This argument misses its mark. While the timing of the loans may be evidence of a lack of an overall plan to bail out mortgage proceeds from the very start, as under *Johnson v. Commissioner*,

[6]Under petitioner's rationale, for instance, a taxpayer could place a $95,000 mortgage on a property valued at $100,000 and with a basis to him of $5,000. He would then pocket the $95,000 in cash and donate the property, tax free, to a donee who would take the property subject to the mortgage. On the other hand, if that same taxpayer had sold the property, he would have realized $95,000 in gain. This result is even more ludicrous if the donee sells the encumbered property upon receipt. In the example, the donee would realize a gain of $95,000, the excess of $100,000 realized over a substituted basis of $5,000. This amount realized would be further reduced by the applicable capital gains tax on $95,000. In essence, the $95,000 gain and the accompanying tax could exceed the value of the property. Therefore, under petitioner's gift theory, a donor of encumbered property would be at a significant economic advantage, whereas the donee of such property would be at a material economic disadvantage, a result which we cannot believe Congress intended.

[7]The record is silent on the question of whether the donor used any portion of the loan proceeds to pay the gift tax on the transfer as in *Johnson v. Commissioner*, 59 T.C. 791 (1973), affd. 495 F.2d 1079 (6th Cir. 1974). Nevertheless, *Johnson* has been interpreted to stand for the combination gift and sale transaction. See *Hirst v. Commissioner*, 63 T.C. 307 (1974), affd. 572 F.2d 427 (4th Cir. 1978). Compare *Turner v. Commissioner*, 49 T.C. 356 (1968), affd. per curiam 410 F.2d 752 (6th Cir. 1969) (net gift), with *Johnson v. Commissioner, supra* (part gift, part sale).

*supra*, nevertheless, decedent has reaped a tangible economic benefit from this transaction and such economic benefit is subject to tax under the rationale of *Crane v. Commissioner*, *supra*.

Decedent's purported nontaxable transfer also fails to withstand scrutiny under the constructive receipt of income theory. Section 61(a) provides, in relevant part, that gross income means all income from whatever source derived, including (but not limited to) 15 separate items. Income from discharge of indebtedness, under section 61(a)(12), is one item includable in gross income. Thus, the assumption of a debt by a donee, that benefits the donor, is generally regarded as the constructive receipt of income. *Old Colony Trust Co. v. Commissioner*, 279 U.S. 716, 729 (1929).

A nonrecourse mortgage debt is a debt of the property owner since he is, in reality, a quasi-obligor on the debt, notwithstanding the fact that the debt is owed by the property. Cf. *Woodsam Associates, Inc. v. Commissioner*, 16 T.C. 649, 654 (1951), affd. 198 F.2d 357 (2d Cir. 1952). This means that gain is realized where a mortgage debt is assumed by the donee since such assumption is the equivalent of the constructive receipt of cash by the donor. *Crane v. Commissioner*, 331 U.S. at 13–14.

Finally, by the trustee taking the 20–24 Vesey Street property subject to the mortgages, he also assumed the unpaid or accrued interest liabilities. *Clodfelter v. Commissioner*, 48 T.C. 694, 701–703 (1967), affd. 426 F.2d 1391 (9th Cir. 1970). The outstanding liabilities[8] which were assumed and paid by the trustee are similarly treated as includable in decedent's amount realized on the transfer since decedent was relieved of a personal liability. *Crane v. Commissioner*, *supra*.

Therefore, after a careful review of the entire record and for all of the above reasons, we hold that decedent realized gain to the extent of $425,051.79 upon the transfer of the 20–24 Vesey Street property, encumbered beyond its adjusted basis and with outstanding liabilities, to a trust for the benefit of his grandchildren.

Because of concessions,

*Decision will be entered under Rule 155.*

---

[8] Of the $124,573.58 of expenses incurred by decedent in 1969 and accrued and paid by the trust, $117,716.53 represents permanent improvements to the 20–24 Vesey Street property and, as such, has

been added to that property's adjusted basis. Therefore, the inclusion of this sum in the amount realized is a "wash," resulting in a net increase in the amount realized of $6,857.05.